Filed 9/24/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| GERAWAN FARMING, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> AGRICULTURAL LABOR RELATIONS BOARD, <br><br> Defendant and Respondent; <br><br> LUPE GARCIA, <br><br> Intervener and Appellant. | F076148, F076150 <br><br> (Super. Ct. No. 13CECG03374) <br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Mark Wood Snauffer, Judge.

Irell & Manella, David A. Schwarz, Grace Chuchla; Georgeson & Belardinelli, C. Russell Georgeson; and Michael P. Mallery for Plaintiff and Appellant, Gerawan Farming, Inc.

Sagaser, Watkins & Wieland and Paul J. Bauer for Intervener and Appellant, Lupe Garcia.

Santiago Avila-Gomez and Todd M. Ratshin for Defendant and Respondent.

-ooOoo-

After agricultural employer Gerawan Farming, Inc. (Gerawan) and the United Farm Workers Union (UFW) failed to agree on the terms of an initial collective bargaining agreement (CBA), the Agricultural Labor Relations Board (Board), at the UFW's request, ordered the parties to "mandatory mediation and conciliation" (MMC) under the MMC statutory scheme, Labor Code section 1164 et seq.[1]  In the MMC process, the parties present their disputed and undisputed issues to the mediator, who takes evidence and hears argument on the disputed issues in recorded proceedings, but retains discretion to go off the record at any time to clarify or resolve issues informally. (Cal. Code Regs., tit. 8, § 20407, subd. (a)(2).)[2]  After the mediation period expires, if the parties do not "resolve the issues to their mutual satisfaction," the mediator submits a "report" to the Board that resolves all of the parties' issues and establishes the CBA's final terms.  The grounds for the mediator's determination of disputed issues must be stated in the report and supported by the record.  (§ 1164, subds. (c) & (d).)  When the report becomes the Board's final order, it establishes the terms of an imposed, binding CBA.  (§ 1164.3, subds. (a)-(e).)

---

[1]     Undesignated statutory references are to the Labor Code.

[2]     Further references to regulations are to title 8 of the California Code of Regulations.

2.

Four mediation sessions were held, two of which were on-the-record sessions in which witness testimony was transcribed by a court reporter.  Lupe Garcia (Garcia), a Gerawan employee, attempted to attend and observe an early MMC proceeding, but the mediator denied his request.  Garcia asked the Board to decide whether he and other Gerawan employees had the right to attend on-the-record MMC proceedings under the federal and state Constitutions.  The Board issued a decision in which it held the public does not have a constitutional right to attend MMC proceedings.  (*Gerawan Farming, Inc.* (2013) 39 ALRB No. 13.)  Gerawan filed a declaratory relief action in superior court, seeking a judicial declaration that the Board's decision violates the right of public access protected under the federal and state Constitutions.  Garcia intervened in the same action and filed a complaint in intervention seeking the same relief.

In this appeal by Gerawan and Garcia,[3] we are called to review simultaneous summary judgment motions filed by Gerawan, Garcia, and the Board, on the issue of whether there is a public right of access to on-the-record MMC proceedings under the federal and state Constitutions, and whether Gerawan has standing to challenge the Board's decision.  The trial court found that while Gerawan had standing, the Board's decision was not unconstitutional, as the public does not have a constitutional right of access to MMC proceedings.  The trial court granted summary judgment in favor of the Board, and against Gerawan and Garcia, and entered judgment in the Board's favor. Gerawan and Garcia challenge the trial court's ruling, arguing the Board's decision is unconstitutional, while the Board renews its argument that Gerawan has no standing. While we conclude Gerawan lacks standing, we agree with the trial court that there is no right of access under the federal and state Constitutions to on-the-record MMC proceedings.  Accordingly, we affirm the judgment.

---

**3**      Gerawan and Garcia separately appealed from the resulting judgment in the Board's favor on their complaints.  We granted the parties' stipulation to consolidate the appeals.

## THE STATUTORY FRAMEWORK

### *The ALRA*

In 1975, the Legislature enacted the Agricultural Labor Relations Act (ALRA) "to provide for collective-bargaining rights for agricultural employees" (§ 1140.2) by putting into place a system of laws generally patterned after the National Labor Relations Act (29 U.S.C. § 151; the NLRA). (*J.R. Norton Co. v. Agricultural Labor Relations Board* (1979) 26 Cal.3d 1, 8; see § 1148 [in implementing the ALRA, the Board follows applicable NLRA precedents].) The ALRA was enacted to " 'ensure peace in the agricultural fields by guaranteeing justice for all agricultural workers and stability in labor relations,' " which the ALRA achieves by declaring " 'the right of agricultural employees to organize themselves into unions and to engage in collective bargaining, free from intimidation by either employers or union representatives.' " (*Gerawan Farming, Inc. v. Agricultural Labor Relations Bd.* (2017) 3 Cal.5th 1118, 1131 (*Gerawan Farming I*).)

"Under the ALRA, '[r]epresentatives designated or selected by a secret ballot for the purposes of collective bargaining by the majority of the agricultural employees in the bargaining unit shall be the exclusive representatives of all the agricultural employees in such unit for the purpose of collective bargaining with respect to rates of pay, wages, hours of employment, or other conditions of employment.' (§ 1156, see § 1156.3 [setting forth the election process].)" (*Gerawan Farming I, supra,* 3 Cal.5th at p. 1131.) After the election, the Board "shall certify" the result unless it determines based on a sustained election challenge "that there are sufficient grounds to refuse to do so." (§ 1156.3, subd. (e)(2) [stating grounds for such refusal].) "The ALRA also provides a process by which employees may petition to decertify a labor organization as their representative. (§ 1156.7.)" (*Gerawan Farming I,* at pp. 1131–1132.)

When a labor organization is certified as an election winner, thereby becoming the employees' bargaining representative, certain legal consequences follow. First, a

statutory bar exists to holding another representation election for at least the initial one-year certification period.  (§§ 1155.2, subd. (b), 1156.5, 1156.6.)  Second, a duty to bargain is created, which requires the employer and labor representative to "bargain collectively in good faith" in order to reach an agreement "with respect to wages, hours, and other terms and conditions of employment," although "such obligation does not compel either party to agree to a proposal."  (§ 1155.2, subd. (a).)  The duty to bargain "has no time limit"—the duty continues until the union is replaced or decertified through a subsequent election.  (*Gerawan Farming I, supra,* 3 Cal.5th at pp. 1153–1154.)  Once a union is certified, it "remains the employees' exclusive bargaining representative until it is decertified or until the union is unwilling or unable to represent the bargaining unit." (*Id.* at p. 1155.)

**The MMC Process**

In 2002, the Legislature determined "additional legislation was necessary to fulfill the goals of the ALRA because it had proven ineffective at facilitating the negotiation and completion of [CBAs].  The Legislature therefore enacted the ALRA's 'mandatory mediation and conciliation' (MMC) provisions to 'ensure a more effective collective bargaining process between agricultural employers and agricultural employees.' " (*Gerawan Farming I, supra,* 3 Cal.5th at p. 1130.)  "The MMC statute sets forth a process, known as compulsory interest arbitration, 'in which the terms and conditions of employment are established by a final and binding decision of an arbitrator.'  [Citation.] Unlike 'grievance arbitration,' which focuses on 'construing the terms of an existing agreement and applying them to a particular set of facts,' interest arbitration 'focuses on what the terms of a new agreement should be.'  [Citation.]  The MMC process results in 'quasi-legislative action' by which '[t]he terms of the "agreement" determined by the arbitrator [are] imposed upon [the employer] by force of law.' " (*Id.* at p. 1133.)

An agricultural employer or certified labor organization invokes the MMC process by filing a declaration with the Board which states the parties failed to reach a CBA and

5.

requests the Board to order the parties to MMC. (§ 1164, subd. (a).) If the declaration satisfies the statutory requirements, "the board shall immediately issue an order directing the parties to [MMC] of their issues." (§ 1164, subd. (b); Cal. Code Regs., § 20402.) The Board then requests a list of nine mediators with experience in labor mediation from the California State Mediation and Conciliation Service, from which the parties select a mediator. The parties bear equally the costs of mediation and conciliation. (§ 1164, subd. (b); Cal. Code Regs., § 20403.)

Once appointed, the mediator "shall immediately schedule meetings at a time and location reasonably accessible to the parties." (§ 1164, subd. (c); Cal. Code Regs., § 20405 ["The mediator shall appoint a time and place for the mediation …."].) "Mediation" proceeds for a period of 30 days; on "expiration of the 30-day period, if the parties do not resolve the issues to their mutual satisfaction, the mediator shall certify that the mediation process has been exhausted." (§ 1164, subd. (c).) The mediation period may be extended an additional 30 days "[u]pon mutual agreement of the parties." (§ 1164, subd. (c); Cal. Code Regs., § 20407, subd. (a) ["The 30-day timelines may be waived by mutual agreement of the parties and with the approval of the mediator."].) The 30-day period commences "on the date of the first scheduled mediation session." (Cal. Code Regs., § 20407, subd. (a).)

The Board's implementing regulations specify how the mediation is to be conducted. Within seven days of receipt of a Board order directing the parties to MMC, the parties are required to serve on each other, and on the mediator upon his or her selection, a document which identifies the disputed and undisputed issues, as well as the standards by which they propose to resolve the disputed issues, and provides agreed upon contract language for the issues not in dispute. (Cal. Code Regs., § 20407, subd. (a)(1).) Thereafter, each party may demand from the other a witness list, which designates those witnesses who are experts, and a list of documents the party intends to introduce on the record at the mediation. (*Id*., §§ 20406, subd. (a), 20407, subd. (a).) Subpoenas requiring

6.

witness attendance and testimony, or the production of materials, may be issued on a party's ex parte request—a Board member or Board-authorized person issues the subpoena if the request is made before the mediation begins, while the mediator addresses those requests made at or after the first mediation session. (*Id*., § 20406, subd. (b).) The mediator may enforce discovery duties by drawing adverse inferences, or imposing terms, conditions, or sanctions upon a party. (*Id*., § 20406, subd. (d).)

The mediator presides at the mediation, rules on the admission and exclusion of evidence, as well as procedural questions, and "shall exercise all powers relating to the conduct of the mediation." (Cal. Code Regs., § 20407, subd. (a)(2).) The evidence the mediator relies on in writing his or her report "shall be preserved in an official record through the use of a court reporting service or, with the consent of both parties and the approval of the mediator, by a stipulated record." (*Ibid*.) The mediator "shall retain the discretion to go off the record at any time to clarify or resolve issues informally," but communications that take place off the record "shall not be the basis for any findings and conclusions in the mediator's report." (*Ibid*.) The parties are required to "provide the mediator with a detailed rationale for each of its contract proposals on issues that are in dispute" and "provide on the record supporting evidence to justify those proposals." (*Id*., § 20407, subd. (a)(1).) In writing his or her report, the mediator is required to "cite evidence in the record that supports his or her findings and conclusions." (*Id*., § 20407, subd. (a)(2).)

The parties have the right to be represented by counsel or other representative, and are entitled to be heard, present evidence, and cross-examine witnesses appearing at the hearing, with witness testimony given under oath. The rules of evidence and judicial procedure, however, "need not be observed." (Cal. Code Regs., § 20407, subd. (a)(3) & (4).)

Within 21 days after the mediation period expires, the mediator files "a report with the board that resolves all of the issues between the parties and establishes the final

terms of a [CBA], including all issues subject to mediation and all issues resolved by the parties prior to the certification of the exhaustion of the mediation process. With respect to any issues in dispute between the parties, the report shall include the basis for the mediator's determination. The mediator's determination shall be supported by the record." (§ 1164, subd. (d); Cal. Code Regs., § 20407, subd. (c) ["The mediator shall issue his or her report within twenty-one (21) days of the last mediation session."].) The official record of the proceeding is available for public inspection at the Board's offices in Sacramento. (Cal. Code Regs., § 20600, subd. (a)(5).)

Either party may petition the Board for review of the mediator's report within seven days of its filing on the ground that one or more provisions are (1) "unrelated to wages, hours, or other conditions of employment," (2) "based on clearly erroneous findings of material fact," or (3) "arbitrary or capricious in light of the mediator's findings of fact." (§ 1164.3, subd. (a).)[4] If a prima facie case for review is not shown or no petition is filed, the report becomes the Board's final order. (§ 1164.3, subd. (b).) If the Board finds grounds to grant review, it issues a decision concerning the petition and, if it finds a provision of the mediator's report to be unlawful, the Board requires the mediator to modify the CBA's terms, meet with the parties for further mediation, and submit a second report. (§ 1164.3, subd. (c).) As before, the parties may petition the Board for review of the second report. (§ 1164.3, subd. (d).) If no petition is filed or the petition does not state a prima facie case of a violation of subdivision (a), the second report takes effect as an order of the Board. (§ 1164.3, subd. (c).) If a petition is subject to review under subdivision (a), the Board determines the issues and issues a final order. (*Ibid.*)

---

**4** Either party also may petition the Board to set aside the report if "(1) the mediator's report was procured by corruption, fraud, or other undue means, (2) there was corruption in the mediator, or (3) the rights of the petitioning party were substantially prejudiced by the misconduct of the mediator." (§ 1164.3, subd. (e).)

Once the Board has issued a final order, a party may petition for writ of review in the Courts of Appeal or California Supreme Court. (§§ 1164.5, 1164.9.) Judicial review is limited to "determin[ing], on the basis of the entire record, whether any of the following occurred: [¶] (1) The board acted without, or in excess of, its powers or jurisdiction. [¶] (2) The board has not proceeded in the manner required by law. [¶] (3) The order or decision of the board was procured by fraud or was an abuse of discretion. [¶] (4) The order or decision of the board violates any right of the petitioner under the Constitution of the United States or the California Constitution." (§ 1164.5, subd. (b).)

In *Gerawan Farming I*, the California Supreme Court rejected the argument that the MMC statutory scheme was unconstitutional and concluded the MMC statute neither violated equal protection nor unconstitutionally delegated legislative power. (*Gerawan Farming I, supra,* 3 Cal.5th at pp. 1130–1131.) The court also held "that employers may not refuse to bargain with unions—whether during the ordinary bargaining process or during MMC—on the basis that the union has abandoned its representative status." (*Id.* at p. 1131.)

## THE HISTORY OF THIS DISPUTE

Gerawan, a family owned farming business based in the Fresno area, grows, harvests, and packs stone fruit and table grapes, and provides employment to several thousand agricultural employees. In 1992, following a contested runoff election, the Board certified the United Farm Workers of America (UFW) as the exclusive bargaining representative of Gerawan's agricultural employees. While some initial bargaining discussions took place, Gerawan and the UFW never entered into a CBA

In October 2012, the UFW demanded negotiations with Gerawan resume. Following several bargaining sessions, the UFW filed a declaration with the Board on March 29, 2013, requesting MMC. The Board granted the UFW's request and directed the parties to MMC. A mediator, Matthew Goldberg, was appointed in May 2013.

9.

*The Mediator Denies Gerawan Employees Access to MMC*

Two mediation sessions were held in June 2013. Longtime Gerawan employee Garcia, his attorney, and a group of other Gerawan employees, attempted to attend the June 11 mediation session, held at a hotel conference room. Garcia attempted to enter the room to attend the session, but Goldberg denied him entry. Garcia's attorney asked Goldberg for permission to attend the session with Garcia and the other employees, explaining they would remain silent and merely observe the process. Goldberg denied the request, as neither the attorney nor the employees were parties to the MMC procedure and the mediation was confidential. Goldberg told Gerawan and the UFW about the request. Gerawan supported the employees' attendance and participation, but the UFW did not. Goldberg repeated his initial determination that the employees would not be permitted to attend because they were not parties.

*Garcia's Petition to Intervene in the MMC Process*

On July 10, 2013, Garcia filed a petition with the Board as an alleged interested party, seeking the Board's permission to formally intervene and participate in the MMC process. The Board found no basis for allowing him to intervene and dismissed the petition on July 29, 2013. In doing so, the Board recognized the UFW, as the certified bargaining representative of Gerawan's agricultural employees, owed Garcia and his fellow employees a duty of fair representation; based on the statutory language, MMC was intended to be between the certified union and the employer; there was no statutory or regulatory authorization for intervention in MMC cases; and "if any employee who wished to do so could intervene in an MMC case, the process could quickly become unworkable and it would be fundamentally inconsistent with the union's status as bargaining representative."

Gerawan submitted a response in support of Garcia's petition in which it argued individual employees, such as Garcia, and other members of the public have a First Amendment right to attend on-the-record MMC proceedings. Garcia, however, did not

raise the issue in his petition. The Board declined to reach the issue because Gerawan lacked standing to assert the legal rights of Garcia and other members of the public.

***The Board's Order Concerning Public Access***

On August 2, 2013, Garcia filed a petition for reconsideration, asking the Board to decide whether the public, including himself and other Gerawan employees, has the right to attend on-the-record MMC proceedings under article I, section 3, subdivision (b) of the California Constitution and the First Amendment to the United States Constitution. On August 21, 2013, the Board denied Garcia's access request in *Gerawan Farming, Inc.*, *supra*, 39 ALRB No. 13 (the Order). Although Garcia's petition did not meet the standard for granting reconsideration, the Board nevertheless granted reconsideration on its own motion because "the issue raised by Garcia—whether Garcia and the public have a right of public access to MMC proceedings under the federal and state constitutions— presents an issue of first impression which, if left unresolved, could potentially result in the deprivation of constitutionally protected rights."

The Board discussed the relevant decisions of the United States and California Supreme Courts, as well as other precedents. The Board determined the MMC process, which imposes "a labor contract negotiation as a result of a bargaining impasse," bears no resemblance to civil trials or court-conducted arbitration proceedings in which the public has a right of access, as "MMC is a quasi-legislative proceeding invoked not to resolve the legal claims of parties, but to force negotiations (mediation) that, if unsuccessful, result in a binding contract imposed on the parties (binding interest arbitration)."

The Board found MMC was not historically open to the press and general public, as "MMC is more akin to a labor contract negotiation, albeit a mandatory one once invoked by one of the parties, and we know of no tradition of labor contract negotiations being open to the public, even those involving public employees." The Board also did not see "how public access would play a significant positive role in the functioning of MMC or any type of labor contract negotiation for that matter." The Board therefore

11.

concluded there was no First Amendment right of access to its "quasi-legislative proceeding known as MMC." The Board also ruled the public had no right of access to MMC proceedings under the California Constitution.

***The MMC Proceedings and Resulting CBA***

Gerawan and the UFW participated in MMC proceedings in June and August 2013, which included two on-the-record hearings, held at hotels in Modesto and Oakland on August 8 and 19, 2013, respectively.[5] As the parties were unable to voluntarily agree to all terms of a CBA, Goldberg issued a report to the Board on September 28, 2013, which fixed the CBA's terms. Gerawan filed a petition for review of Goldberg's report, which the Board granted as to several terms. The Board remanded the matter to Goldberg in accordance with section 1164.3, subdivision (c). The parties met with Goldberg and reached agreement on the remanded terms, which Goldberg incorporated into a second report dated November 6, 2013. (*Gerawan Farming, Inc.* (2013) 39 ALRB No. 17, p. 2.) No party requested review of the second report and the Board ordered it to take effect as a final order of the Board.

On November 5, 2013, the Board conducted a decertification election at Gerawan after a majority of Gerawan workers petitioned the Board to hold an election to decide whether the UFW would remain their certified bargaining representative. The Board impounded the ballots, subject to postelection proceedings to determine whether to set aside the election based on the UFW's objections. (*Gerawan Farming, Inc.* (2013) 39 ALRB No. 20, p. 1.)

***This Lawsuit***

Gerawan filed its complaint for declaratory relief in Fresno County Superior Court on October 28, 2013. The complaint alleged three causes of action. In the first and

---

[5] Notably, Daniel Gerawan sought assurances and an order from the mediator in the underlying MMC proceedings that there would not be any visual or audio recording of his testimony.

12.

second causes of action, Gerawan sought a judicial declaration that the Board's Order violates the federal and state Constitutions by denying members of the public and the press a right of access to the on-the-record phase of the MMC process. In the third cause of action, Gerawan sought damages, attorney fees and injunctive relief under section 1983 of title 42 of the United States Code (42 U.S.C. § 1983) against individual Board members or officials, premised on the alleged violation of access rights under the federal Constitution. Gerawan requested declarations that (1) the Board's Order is unconstitutional under the federal and state Constitutions, and (2) the MMC proceedings between Gerawan and the UFW are null and void.

Two months later, Garcia filed a motion to intervene in the action in order to file a proposed complaint in intervention, which the trial court granted. Garcia subsequently filed a complaint in intervention. Like Gerawan's complaint, Garcia's complaint in intervention sought, in the first and second causes of action, a judicial declaration that the Board's Order violated federal and state constitutional protections of a right of public access to such proceedings. Garcia also sought, in his fourth cause of action, damages, attorney fees and injunctive relief under 42 U.S.C. section 1983 against individual Board members.[6]

### The Board's Demurrers

The Board demurred to both the complaint and complaint in intervention, arguing primarily that the trial court lacked jurisdiction to hear any challenge to the Board's decision based on section 1164.9.[7] The Board also argued no cause of action was available against the individual Board members under 42 U.S.C. section 1983. In

---

[6] In July 2014, the trial court granted the Board's motion to strike Garcia's third cause of action, which sought a declaration that the Board's denial of his request to be heard during the on-the-record proceedings violated the California Constitution.

[7] Section 1164.9 provides, in relevant part: "No court of this state, except the court of appeal or the Supreme Court, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the board …."

13.

addition, in its demurrer to Garcia's complaint in intervention, the Board argued his pleading was untimely under section 1164.5's 30-day deadline for seeking judicial review and declaratory relief was not a proper means for challenging the Board's rulings.

On May 15, 2014, following a hearing on the demurrer to Gerawan's complaint and the submission of letter briefs, the trial court sustained the demurrer without leave to amend. The trial court concluded the jurisdictional bar of section 1164.9 was dispositive of the matter and the 42 U.S.C. section 1983 claim failed because the individual defendants were immune. Following a separate hearing on the demurrer to Garcia's complaint in intervention, the trial court sustained the demurrer without leave to amend based on the jurisdictional bar of section 1164.9 and Garcia's failure to seek judicial review within 30 days of the Board's Order. The trial court further found the individual defendants were immune from liability under 42 U.S.C. section 1983.

### The Prior Appeal

Gerawan and Garcia appealed the resulting judgments entered against them. In a partially published opinion, this court held section 1164.9 is unconstitutional to the extent it purports to completely divest superior courts of jurisdiction. Accordingly, we reversed the judgments of dismissal and remanded the case to the trial court, as it had jurisdiction to reach the constitutional issues raised in Gerawan's and Garcia's complaints.[8] (*Gerawan Farming II, supra,* 247 Cal.App.4th at p. 289.)

In the unpublished portion of the opinion, we held section 1164.5's timing provision did not apply to Garcia's claims and declaratory relief was the proper vehicle to challenge the legal validity of the Board's Order. (*Gerawan Farming II*, *supra*, F069896

---

[8]     Our earlier opinion is contained in the appellant's appendix of the present appeal. That prior opinion was partially published; the nonpublished portions of the opinion fall within the exception to California Rules of Court, rule 8.1115(b)(1). (See *Gerawan Farming, Inc. v. Agricultural Labor Relations Bd.* (2016) 247 Cal.App.4th 284 (*Gerawan Farming II*); see also *id*. (May 9, 2016, F069896) [nonpub. opn.].)

14.

[nonpub. opn.].)  With respect to the trial court's ruling on the 42 U.S.C. section 1983 causes of action, we affirmed to the extent it eliminated any damage claims against the Board or its individual officials or members, but reversed because a limited basis for relief under 42 U.S.C. section 1983 exists for prospective injunctive relief against the individual defendants in their official capacities, subject to the prerequisite of "an ongoing violation of federal constitutional law concerning public access."  (*Gerawan Farming II*, *supra*, F069896 [nonpub. opn.].)  Finally, we declined to reach the underlying question of whether the Board's Order violated the right of public access protected under the federal or state Constitutions, and instead remanded to the trial court for further proceedings.  (*Ibid.*)

### *The Summary Judgment Motions*

Following issuance of the remittitur, the Board answered Gerawan's and Garcia's complaints, asserting as an affirmative defense to Gerawan's complaint that Gerawan lacked standing.  The parties thereafter agreed to proceed on cross-summary judgment motions on the issue of whether there is a public right of access to on-the-record MMC proceedings under the federal and state Constitutions, with each party filing a separate motion.  In addition to arguing it was entitled to summary judgment on appellants' constitutional claims because no legal right of access to MMC proceedings exists, the Board argued it was entitled to summary judgment on Gerawan's complaint because Gerawan lacked standing to assert them.

After hearing argument on the motions and taking the matter under submission, the trial court issued its order denying appellants' summary judgment motions, and granting summary judgment in the Board's favor on appellants' complaints.  The trial court first found Gerawan had standing to bring its suit, as it pled an independent interest in attending other employers' MMC proceedings.  The trial court, however, found that the Board's Order did not violate the federal and state Constitutions, as the public did not have a right of access to MMC proceedings under either the federal or state Constitutions,

15.

and since there was no violation of the federal Constitution, the 42 U.S.C. section 1983 claims also failed. The trial court rejected Garcia's additional arguments that the Board's Order was an unconstitutional prior restraint on speech and constituted viewpoint discrimination.

During the pendency of this appeal, the Board certified the results of the decertification election in *Gerawan Farming, Inc.* (2018) 44 ALRB No. 10, pages 11–12. Under established Board precedent, the UFW's decertification dates back to the date of the election. (*Gerawan Farming, Inc.* (2018) 44 ALRB No. 11, p. 13.)[9]

## DISCUSSION

### I. Standard of Review

Appellants' challenge to the trial court's ruling denying their summary judgment motions and granting the Board's motions is based on undisputed facts and is limited solely to questions of law. Whether analyzed under the review standard applicable to summary judgment motions or the standard applicable to issues of law, our review is de novo and independent. (*Hill Brothers Chemical Co. v. Superior Court* (2004) 123 Cal.App.4th 1001, 1005 ["Summary judgment is properly granted when the papers show there is no triable issue of material fact, and the moving party is entitled to judgment as a matter of law. [Citation.] Issues of law, including statutory construction and the application of that construction to a set of undisputed facts, are subject to this court's independent review."]; see *Sorenson v. Superior Court* (2013) 219 Cal.App.4th 409, 424

---

[9] We asked the parties to address in supplemental briefing the effect, if any, of the UFW's decertification on the issues or arguments raised, in this appeal. The parties agree that the decertification does not render this appeal moot. We agree. (See *Clovis Unified School Dist. v. Chiang* (2010) 188 Cal.App.4th 794, 809 [declaratory relief is an appropriate method to challenge an administrative agency's " 'overarching, quasi-legislative policy' "]; *People v. Harrison* (2013) 57 Cal.4th 1211, 1217–1218 [court exercised inherent discretion to resolve issue that had become moot as to the defendant, as it was an issue of "broad public interest that is likely to recur" and was likely to evade review].)

(*Sorenson*) ["Where the issue to be decided implicates First Amendment rights, appellate courts are required to conduct an independent review of the record."]; *Silvers v. Board of Equalization* (2010) 188 Cal.App.4th 1215, 1219 [review of trial court's decision is de novo where "the case concerns the application of constitutional and statutory provisions to undisputed facts."].)

## II.     Gerawan Has No Standing

We first address the Board's contention that Gerawan lacks standing to assert any of the causes of action alleged in its complaint.  The Board contends Gerawan does not have standing because it has not asserted any claim on its own behalf and has not suffered any injury or constitutional deprivation.  Instead, the Board asserts, Gerawan's complaint, as well as its summary judgment motion, focuses solely on the attempts by Garcia and other Gerawan employees to attend the MMC proceedings and purports to advocate their interests, not its own.  The Board further argues that, by asserting the constitutional rights of its employees, Gerawan impermissibly interferes with the employee-union relationship.[10]

"A declaratory relief action requires an 'actual controversy relating to the legal rights and duties of the respective parties.'  (Code Civ. Proc., § 1060.)  Courts will decline to resolve lawsuits that do not present a justiciable controversy, and justiciability 'involves the intertwined criteria of ripeness and standing.' "  (*County of San Diego v. San Diego NORML* (2008) 165 Cal.App.4th 798, 813.)

"As a general principle, standing to invoke the judicial process requires an actual justiciable controversy as to which the complainant has a real interest in the ultimate

---

**10**     While this court concluded in the prior appeal that Gerawan's declaratory relief claims could be heard in superior court, we held only that the superior court had jurisdiction to hear and consider the causes of action alleged in Gerawan's complaint. (*Gerawan Farming, II, supra,* F069896 [nonpub. opn.].)  We did not address whether Gerawan had standing to raise its claims.

17.

adjudication because he or she has either suffered or is about to suffer an injury of sufficient magnitude reasonably to assure that all of the relevant facts and issues will be adequately presented to the adjudicator. [Citations.] To have standing, a party must be beneficially interested in the controversy; that is, he or she must have 'some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large.' [Citation.] The party must be able to demonstrate that he or she has some such beneficial interest that is concrete and actual, and not conjectural or hypothetical. A complaining party's demonstration that the subject of a particular challenge has the effect of infringing some constitutional or statutory right may qualify as a legitimate claim of beneficial interest sufficient to confer standing on that party." (*Holmes v. California Nat. Guard* (2001) 90 Cal.App.4th 297, 314–315; see *Azusa Western, Inc. v. City of West Covina* (1975) 45 Cal.App.3d 259, 266 [" 'It is a firmly established principle of law that one may not urge the unconstitutionality of a statute unless his rights are adversely affected thereby ….' "].) "The focus of the standing inquiry is on the plaintiff, not on the issues he or she seeks to have determined." (*Surrey v. TrueBeginnings, LLC* (2008) 168 Cal.App.4th 414, 417, disapproved on another point in *White v. Square, Inc*. (2019) 7 Cal.5th 1019, 1033.)

Here, Gerawan alleged in its complaint it had an interest in attending other agricultural employer's MMC proceedings, which the Board's Order would preclude it from doing. Specifically, Gerawan alleged it: (1) "has a constitutional right of access to government proceedings"; (2) "has the right to attend any [on-the-record] Proceeding, whether or not it is the party compelled into the process"; (3) "has an interest in seeking vindication of its right … to know the process by which the ALRB determines state-imposed contracts with profound and expansive impact on agriculture in the State of California; and (4) "is not excepted from the California Constitution's guarantee that '*the people*' of this State have the right of public access." Moreover, in its declaratory relief

18.

causes of action, Gerawan alleged the Board's actions violated its "right to public access to on-the-record MMC proceedings."

The Board argues these allegations are insufficient to confer standing because Gerawan's complaint does not allege Gerawan asked to attend other employer's MMC proceedings but was denied access, or even mention other employer's MMC proceedings. Instead, Gerawan's complaint focuses solely on Garcia's attempts, and those of other Gerawan employees, to attend MMC proceedings between it and the UFW, and purports to advocate their interests in attending those proceedings. We agree. In order to have standing to challenge the Board's no access policy, Gerawan must establish it suffered a concrete injury as a result of the policy, such as by alleging it attempted to attend an MMC, but was denied access. (*N.Y. Civil Liberties Union v. N.Y. City Transit* (2d Cir. 2012) 684 F.3d 286, 295 (*NYCLU*).)

Gerawan's challenge to the Board's no access policy is essentially a facial challenge, as Gerawan has not yet been denied access to an MMC proceeding. For example, a plaintiff whose constitutional rights have not been violated may bring a facial challenge to a law, which requires the party to demonstrate the legislation is invalid under any set of circumstances. (*People v. Hsu* (2000) 82 Cal.App.4th 976, 982; *United States v. Salerno* (1987) 481 U.S. 739, 745; *Tennison v. Paulus* (9th Cir. 1998) 144 F.3d 1285, 1287.) "[A] plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." (*Warth v. Seldin* (1975) 422 U.S. 490, 499.) The reasons for this rule are to prevent unnecessary pronouncements and premature statutory interpretations " 'in areas where their constitutional application might be cloudy,' " and to assure that issues before the court "will be concrete and sharply presented." (*Secretary of State of Md. v. J.H. Munson Co.* (1984) 467 U.S. 947, 955.)

The limitation that a party must assert his own legal rights is relaxed when a party brings a facial challenge implicating the free speech aspect of the First Amendment.

19.

(*Tennison v. Paulus, supra,* 144 F.3d at p. 1287; *Prigmore v. City of Redding* (2012) 211 Cal.App.4th 1322, 1349; *People v. Hsu, supra,* 82 Cal.App.4th at p. 982.) This is because "when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged." (*Secretary of State of Md. v. J.H. Munson Co., supra,* 467 U.S. at p. 956.)

Although Gerawan raises a First Amendment challenge to the Board's policy, the basis of the challenge is the right of access, not the right of free speech. The relaxed standing rules for First Amendment facial challenges have been applied in the free speech area, the rationale being that the relaxed rules are necessary to prevent a chilling of free speech. We are not aware of any case that applied such relaxed standing requirements in right of access cases, and Gerawan has cited no such case authority. We conclude Gerawan has no standing to challenge the Board's policy on First Amendment grounds. Accordingly, we will address only Garcia's arguments on the right of access issue.

## III.  Constitutional Right of Access to MMC Proceedings

The United States Supreme Court has recognized that the First Amendment, which applies to the states through the Fourteenth Amendment, embodies a qualified "right of access" of the press and public to attend certain governmental proceedings. (*Press-Enterprise Co. v. Superior Court* (1986) 478 U.S. 1, 9 (*Press-Enterprise II*).) The Supreme Court first articulated this right in *Richmond Newspapers, Inc. v. Virginia* (1980) 448 U.S. 555, 580 (*Richmond Newspapers*), in which seven Justices recognized there is a qualified right of access under the First Amendment to attend criminal trials.[11] (*Globe Newspaper Co. v. Superior Court* (1982) 457 U.S. 596, 603 [striking down as unconstitutional a state statute mandating that the testimony of minor victims in criminal

---

[11]  To avoid confusion, we will refer to the United States Supreme Court as the "Supreme Court," and the California Supreme Court as the "high court."

trials involving certain sex offenses be taken in closed proceedings].)  The Supreme Court subsequently extended this right of access to the jury selection process in a criminal trial (*Press-Enterprise Co. v. Superior Court* (1984) 464 U.S. 501, 511, 513 (*Press-Enterprise I*), and criminal preliminary hearings (*Press-Enterprise II*, at pp. 8–9.)

In *Press-Enterprise II*, the Supreme Court described a two-part test for access claims:  "In cases dealing with the claim of a First Amendment right of access to criminal proceedings, our decisions have emphasized two complementary considerations.  First, because, a ' "tradition of accessibility implies the favorable judgment of experience," ' [citations], we have considered whether the place and process have historically been open to the press and general public.  [¶] … [¶]  Second, in this setting the Court has traditionally considered whether public access plays a significant positive role in the functioning of the particular process in question….  [¶]  These considerations of experience and logic are, of course, related, for history and experience shape the functioning of governmental processes.  If the particular proceeding in question passes these tests of experience and logic, a qualified First Amendment right of public access attaches."  (*Press-Enterprise II*, *supra*, 478 U.S. at pp. 8–9.)

When a right of access attaches, however, it is not absolute.  (*Press-Enterprise II, supra,* 478 U.S. at p. 9.)  " '[The] presumption [of access] may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.  The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.' "  (*Id.* at pp. 9–10.)

Based on this Supreme Court precedent, one California appellate court declined to extend the constitutionally protected public right of access to trials and pretrial proceedings in criminal cases to juvenile dependency proceedings.  (*San Bernardino County Dept. of Public Social Services v. Superior Court* (1991) 232 Cal.App.3d 188, 192.)  In its decision, the court explained the Supreme Court's cases, taken together,

"indicate that (1) the right of access does not extend automatically to every proceeding in court; (2) whether the right extends to a particular proceeding depends on whether the particular proceeding passes the tests of experience and logic (*Press–Enterprise II*); (3) if the right does apply to a particular proceeding, a statute mandating that such proceeding be closed is unconstitutional (*Globe*); and finally (4) if there is a constitutional right of access to a particular proceeding, any order closing all or part of that proceeding must be supported by articulated findings indicating that closure is necessary to serve an overriding and compelling state interest and that the order closing the proceedings is narrowly tailored to serve that interest." (*Id.* at p. 197.)

While the Supreme Court has not explicitly recognized a First Amendment right of access outside the criminal context, our high court, as well as numerous federal circuit courts, have held the right applies to civil as well as criminal proceedings. (*NBC Subsidiary* (*KNBC-TV*), *Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1181–1182 (*NBC Subsidiary*); *Rushford v. New Yorker Magazine, Inc.* (4th Cir. 1988) 846 F.2d 249, 253-254; *Westmoreland v. Columbia Broadcasting System, Inc.* (2d Cir. 1984) 752 F.2d 16, 22; *Publicker Industries, Inc. v. Cohen* (3d Cir. 1984) 733 F.2d 1059, 1070; *Matter of Continental Illinois Securities Litigation* (7th Cir. 1984) 732 F.2d 1302, 1308; *Brown & Williamson Tobacco Corp. v. F.T.C* (6th Cir. 1983) 710 F.2d 1165; *Newman v. Graddick* (11th Cir. 1983) 696 F.2d 796, 801.)

In *NBC Subsidiary*, our high court held, "in light of [Supreme Court] case law and its progeny, that, in general, the First Amendment provides a right of access to ordinary civil trials and proceedings, [and] that constitutional standards governing closure of trial proceedings apply in the civil setting …." (*NBC Subsidiary, supra,* 20 Cal.4th at p. 1212.) Thus, "substantive courtroom proceedings in ordinary civil cases are 'presumptively open' and that [Code of Civil Procedure] section 124 [governing public court sittings] must be interpreted to preclude closure of proceedings that satisfy the [Supreme] court's historical tradition/utility considerations…." (*Id.* at p. 1217.) "The

22.

presumption of openness, or preclusion of closure, in ordinary civil cases applies unless the trial court (1) provides notice of a contemplated closure, and (2) holds a hearing and expressly finds that: '(i) there exists an overriding interest supporting closure and/or sealing; (ii) there is a substantial probability that the interest will be prejudiced absent closure and/or sealing; (iii) the proposed closure and/or sealing is narrowly tailored to serve the overriding interest; and (iv) there is no less restrictive means of achieving the overriding interest.' " (*In re Marriage of Burkle* (2006) 135 Cal.App.4th 1045, 1052, citing *NBC Subsidiary*, at pp. 1217–1218.)

Our high court, however, emphasized its decision was a limited one: "We address herein the right of access to ordinary civil proceedings in general, and not any right of access to particular proceedings governed by specific statutes." (*NBC Subsidiary, supra,* 20 Cal.4th at p. 1212, fn. 30.) Later, our high court reiterated the limited nature of its holding in *NBC Subsidiary* and noted that in that decision, it explained the concern that a constitutional right of access, " ' "if not subjected to practical limitations, would theoretically warrant permitting the public to sit and contemporaneously eavesdrop upon everything their government does," ' … 'has been accounted for in decisions that have been careful not to extend the public's right of access beyond the adjudicative proceedings and filed documents *of trial and appellate courts*.' (*NBC Subsidiary,* at p. 1212, italics added, fn. omitted.)" (*Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1303.) In addition, our high court has declined to extend the First Amendment right of access to records of the State Bar of California, as the First Amendment requires disclosure to the public of "records of civil and criminal adjudicatory proceedings" and State Bar records "are not records of adjudicatory proceedings." (*Sander v. State Bar of California* (2013) 58 Cal.4th 300, 319, fn. 7.)

This case requires us to decide whether the presumption of openness applies to on-the-record MMC proceedings.

23.

### A. *It is Garcia's Burden to Show a Presumed Right of Access*

Garcia asserts the trial court's decision was based on "the erroneous assumption that courts presume that government proceedings are closed unless the party who is seeking access points to a specific statute mandating openness or provides evidence that access is necessary to remedy the harms that would be caused by secrecy." Garcia contends he is entitled to a presumption of access because, under the First Amendment and California Constitution, government proceedings are presumptively open to the public, and it is the Board's burden to justify closure.

As we have explained, our high court in *NBC Subsidiary* extended the presumption of access only to "ordinary civil trials," not to other proceedings. (See *Phoenix Newspapers v. U.S. Dist. Court* (9th Cir. 1998) 156 F.3d 940, 946 (*Phoenix Newspapers*) ["there is no right of access which attaches to all judicial proceedings, even all criminal proceedings"].) On-the-record MMC proceedings are not ordinary civil trials, and are not even quasi-judicial or quasi-adjudicative. (*Hess Collection Winery v. Agricultural Labor Relations Bd.* (2006) 140 Cal.App.4th 1584, 1598 (*Hess*).) Rather, they are "quasi-legislative in character," as they create new rules for future application. (*Ibid.*; see *Gerawan Farming II, supra,* 3 Cal.5th at p. 1133.) As such, they do not constitute civil proceedings entitled to a presumed right of access.

Since MMC proceedings are not ordinary civil trials, to qualify for a presumption of access, Garcia must first establish through application of the "experience and logic" test that a right of access attaches to on-the-record MMC proceedings. (*Phoenix Newspapers*, *supra*, 156 F.3d at p. 946 [the two-part experience and logic test articulated by the Supreme Court determines whether a right of access attaches to a particular proceeding]; *North Jersey Media Group, Inc. v. Ashcroft* (2002) 308 F.3d 198, 208–209 (*North Jersey*) [applying experience and logic test to determine whether the press and public have a First Amendment right to attend deportation hearings]; *U.S. v. Black* (N.D. Ill. 2007) 483 F.Supp.2d 618, 622–623; *USA v. Sleugh* (N.D. Cal. 2016) 318 F.R.D. 370,

374; *Matter of 2 Sealed Search Warrants* (Del. Super. 1997) 710 A.2d 202, 207 ["[t]he party seeking a First Amendment right of access must make a two-part threshold showing known as the experience and logic tests"].)

If a right of access attaches, then the burden shifts to the Board to present facts to overcome the presumption of disclosure. "If a proceeding fulfills both parts of the test, a qualified First Amendment right of access arises, to be overcome 'only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.' The trial court must articulate this interest 'along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.' " (*Phoenix Newspapers, supra,* 156 F.3d at pp. 946–947, quoting *Press–Enterprise II*, *supra*, 478 U.S. at pp. 9–10.)**12**

Garcia also contends the presumption of access was codified in the California Constitution by Proposition 59, which amended the California Constitution effective November 3, 2004, to specifically provide for "the people's right of access to information in public settings." (*Savaglio v. Wal-Mart Stores, Inc.* (2007) 149 Cal.App.4th 588,

---

**12**    The cases Garcia cites are consistent with this approach. In *Waller v. Georgia* (1984) 467 U.S. 39, the Supreme Court, in holding the Sixth Amendment right to a public trial extended to a suppression hearing, first concluded there was a right of access to suppression hearings and then determined whether the party seeking to close the hearing advanced an overriding interest. (*Id.* at pp. 44–48.) In *Oregonian Pub. v United States Dist. Court for Dist. of Or.* (9th Cir. 1990) 920 F.2d 1462, the court first applied the experience and logic test to determine whether the presumed right of access extended to plea agreements and related documents in criminal cases. (*Id.* at pp. 1465–1466.) Once it determined such a right existed, the presumption of disclosure attached and the party seeking closure had the burden of justifying it. (*Id.* at pp. 1466–1467; accord *United States v. Brooklier* (9th Cir. 1982) 685 F.2d 1162, 1167–1169 [court first concluded that under experience and logic test, the First Amendment right of access attaches to voir dire and then determined whether the party seeking closure established the applicable grounds to support closure]; *In re Marriage of Burkle, supra,* 135 Cal.App.4th at pp. 1060–1061 [applying experience and logic test to determine presumption of access attaches to divorce proceedings, then assessing constitutionality of statute mandating sealing of presumptively open court records at the request of either party].)

597.)[13] He asserts Proposition 59 requires courts to "construe the rules in a manner favoring a right of access." (*Mercury Interactive Corp. v. Klein* (2007) 158 Cal.App.4th 60, 101.) While Proposition 59 provides for the broad construction of statutes furthering the people's right of access to information concerning the conduct of the people's business (Cal. Const., art. I, § 3, subd. (b)(2)), there is nothing to suggest that it independently establishes a right of public access to MMC proceedings. (See *Sorenson, supra,* 219 Cal.App.4th at p. 436, fn. 20 [as no qualified First Amendment right of public access exists with respect to involuntary commitment proceedings, and a statute that predated Proposition 59 created an exception to the requirement of open courtroom proceedings, "[A]rticle I, section 3, subdivision (b) of the California Constitution does not establish independently a right of public access to [those] proceedings"].) While the court stated in *Sorenson* that, with Proposition 59's passage, "the people's right of access to information in public settings [as articulated in *NBC Subsidiary*] now has state constitutional stature, grounding the presumption of openness in civil court proceedings with state constitutional roots" (*Savaglio v. Wal-Mart Stores, Inc., supra,* 149 Cal.App.4th at p. 597), our high court has yet to extend that presumption beyond ordinary civil court proceedings.

Therefore, we must look to the Supreme Court's experience and logic test to determine whether there is a presumed right of access to on-the-record MMC proceedings.

### B. The Experience Prong

"Under the experience prong of the experience and logic test, we 'consider whether "the place and process have historically been open to the press and general

---

[13] Article I, section 3, subdivision (b)(1) of the California Constitution provides: "The people have the right of access to information concerning the conduct of the people's business, and, therefore, the meetings of public bodies and the writings of public officials and agencies shall be open to public scrutiny."

26.

public," because such a "tradition of accessibility implies the favorable judgment of experience." ' [Citation.] In order to satisfy the experience test, the tradition of openness must be strong; however, 'a showing of openness at common law is not required.' " (*Delaware Coalition for Open Government v. Strine* (3d Cir. 2013) 733 F.3d 510, 515 (*Strine*).) The inquiry "is objective" and does not look to " 'the practice of the specific public institution involved, but rather to whether the particular *type* of government proceeding had historically been open in our free society.' " (*PG Pub. Co. v. Aichele* (3d Cir. 2013) 705 F.3d 91, 108 (*PG Pub.*).)

As the Board points out, Garcia offers no evidence of a history of public access to MMC proceedings. The MMC statutes do not specifically provide for such access and Garcia does not provide any history or practice of public access since the statute took effect in 2003.[14]

The lack of history of public access to MMC proceedings is not dispositive, however, since we examine, not the practice of the specific institution, but rather the history of openness of the type of government proceeding involved. The parties disagree as to which history is relevant to this inquiry. Garcia asserts we should examine the history of civil trials and mandatory interest arbitrations, while the Board asserts we should examine the history of collective bargaining and labor arbitrations. In order to

---

[14]     Legislation was proposed in 2015 to amend the MMC statute to deem bargaining unit members parties for the purpose of MMC proceedings and grant them the right to attend all meetings scheduled by the mediator. (Assem. Bill No. 1389 (2015-2016 Reg. Sess.), as amended May 4, 2015, § 2.) As explained in the committee analysis of the bill, the bill "would amend the law" to allow bargaining unit members to attend MMC proceedings. (Assem. Com. on Lab. and Employment, Rep. on Assem. Bill No. 1389 (2015-2016 Reg. Sess.) May 6, 2015.) The Legislature, however, never voted on the proposed legislation. The Board has asked us to take judicial notice of the bill and assembly report, while appellants have asked us to take judicial notice of the "Bill History of Assembly Bill No. 1389," which shows the bill never left the committee and was not voted on by the full Assembly or Senate. We deferred ruling on the requests, which we now grant.

fully consider the "judgment of experience" (*Press Enterprise II, supra,* 478 U.S. at p. 11), we will explore all of these histories. (See *Strine, supra,* 733 F.3d at pp. 515–516 [examining the history of civil trials as well as arbitrations when determining whether government-sponsored arbitrations have a strong tradition of openness].)

### 1. Civil Trials

There is undoubtedly a long history of access to civil trials (*Strine, supra,* 733 F.3d at p. 516) and, as our high court has concluded, the First Amendment provides a right of access to ordinary civil trials and proceedings. (*NBC Subsidiary, supra,* 20 Cal.4th at p. 1212.) "The courthouse, courtroom, and trial remain essential to the way the public conceives of and interacts with the judicial system." (*Strine*, at p. 516.)

### 2. Collective Bargaining

Collective bargaining negotiations historically have been considered private and closed to the public, even in the public sector. Negotiating sessions under the Educational Employment Relations Act (EERA) (Gov. Code, § 3540 et seq.) "are intended to be private unless both parties agree otherwise." (*Ross School District Board of Trustees* (1978) PERB Dec. No. 48, p. 5; see *San Mateo City School Dist. v. Public Employment Relations Bd.* (1983) 33 Cal.3d 850, 964 [public is excluded from actual negotiating sessions under the EERA]; *California Aware v. Joint Labor/Management Benefits Committee* (2011) 200 Cal.App.4th 972, 974, 980 [labor/management committee formed to further college district's collective bargaining with the unions representing the district's employees was exempt from the open meeting requirements of the Ralph M. Brown Act (Brown Act) (Gov. Code, § 54950 et seq.)]; 92 Ops.Cal.Atty.Gen. 102, 105, 106 (2009) [same]; *Petaluma City Elementary School District/Joint Union High School District* (2016) PERB Dec. No. 2485, pp. 28–29 (*Petaluma City*) [there is "a legislative preference or *default rule* that, in the absence of agreement to the contrary, negotiations will occur solely between the parties' representatives"; employees do not have an independent right to attend negotiations].) Similarly, negotiating sessions under the

Meyers-Milias Brown Act (MMBA) (Gov. Code, § 3500 et seq.) are not required to be open to the public, but may be held in private. (61 Ops.Cal.Atty.Gen. 1, 5–6, 20 (1978) [because of the need to caucus and bargain in private, the Legislature did not intend to require "local agencies to do their labor bargaining in a fish bowl"].)

These California authorities are consistent with the findings of other states that collective bargaining negotiations are not open to the public, including: (1) several state supreme courts—*Burlington Community School Dist. v. Public Employment Relations Bd.* (Iowa 1978) 268 N.W.2d 517, 523, *Talbot v. Concord Union School Dist.* (1974) 114 N.H. 532 [323 A.2d 912, 913–914], *Appeal of Exeter* (1985) 126 N.H. 685 [495 A.2d 1288, 1290]; (2) state appellate courts—*State ex rel. Bd. of Pub. Utilities v. Crow* (Mo.Ct.App. 1979) 592 S.W.2d 285, 289–290, *Board of Selectmen v. Labor Relations Com'n* (1979) 7 Mass.App.Ct. 360 [388 N.E.2d 302, 303], *County of Saratoga v. Newman* (1984) 476 N.Y.S.2d 1020 [124 Misc.2d 626, 629]; and (3) a wide consensus among state labor boards—*County of Saratoga* (N.Y. 1984) N.Y. PERB Case Nos. U-7166, U-7191, pp. 8–9, *Brielle Board of Education* (N.J. 1977) N.J. PERC No. 77–72, pp. 7, 11, *Washoe County School Dist.* (1976) Nev. Emp. Mgmt. Rel. Bd., Item No. 54, *Burlington Community School Dist.* (Iowa 1976) 76 PERB 840 [Case No. 840], *City of Sparta and City of Sparta Water Utility* (1976) Wis. Emp. Rel. Comm. Dec. No. 14520, p. 5, *Bethlehem Area School Dist.* (Pa. 1973) 3 PPER 102, 104, *Board of Education of the City of Menominee* (1968) Mich. Lab. Opn. 383 [Case No. C67 E-38].[15]

---

[15] The Board asks us to take judicial notice of seven of these decisions: *Bethlehem Area School District* (Pa. 1973) 3 PPER 102; *Board of Education of the City of Menominee* (Mich. 1968) Mich. Lab. Opn. 383 [Case No. C67 E-38]; *Brielle Board of Education* (N.J. 1977) N.J. PERC No. 77-72; *Burlington Community School District* (Iowa 1976) 76 PERB 840 [Case No. 840]; *City of Sparta and City of Sparta Water Utility* (Wis. 1976) Wisc. Emp. Rel. Comm. Decision No. 14520; *County of Saratoga* (N.Y. 1984) N.Y. PERB Case Nos. U-7166, U-7191; and *Washoe County School District* (Nev. 1976) Nev. Emp. Mgmt. Rel. Bd., Item No. 54. The Board also asks us to take judicial notice of two decisions not mentioned here, *County of Essex* (N.J. 2005) N.J.

Under the NLRA, an employer commits an unfair labor practice when it invites rank-and-file employees to attend negotiations and insists on their presence. (*L.G. Everist, Inc.* (1953) 103 NLRB 308, 308–309; see *Jasper Blackburn Products Corp.* (1940) 21 NLRB 1240, 1250.) This is because the employees' presence is "not conducive to the orderly, informal, and frank discussion of the issues confronting the negotiators necessary to reach a contract," and constitutes "interference with the employees' right to bargain through the representatives of their own choosing." (*L.G. Everist, Inc.,* at pp. 308–309.)

### 3. Labor Arbitrations

Arbitration proceedings in the civil arena have a mixed record of openness. (*Strine, supra,* 733 F.3d at p. 518.) As explained in *Strine*: "Although proceedings labeled arbitrations have sometimes been accessible to the public, they have often been closed, especially in the twentieth century. This closure, however, can be explained by the private nature of most arbitrations. Confidentiality is a natural outgrowth of the status of arbitrations as private alternatives to government-sponsored proceedings. Indeed, we would be surprised to find that private arbitrations—taking place before private arbitrators in private venues—had historically been accessible to the public." (*Id.* at p. 518.)

Arbitrations concerning labor issues generally are private proceedings. (*United Food & Commercial Workers Int'l. Union, etc. v. SIPCO, Inc.* (S.D. Iowa Dec. 30, 1992) 1992 U.S. Dist. LEXIS 21332, at \*25 (*SIPCO*) [finding it improper for the arbitrator to permit nonparties to attend grievance arbitration; "[a]n arbitration is a private proceeding, normally to be attended only by the parties"]; *Hoteles Condado Beach etc. v. Union De etc.* (1st Cir. 1985) 763 F.2d 34, 39 [recognizing that arbitration is "a private proceeding

PERC No. 2005-52 and *King County* (Wash. 1992) Wash. PECB Decision No. 4236. We deferred ruling on the request, which we now grant. (Evid. Code, § 452, subd. (c).)

which is generally closed to the public"]; Elkouri & Elkouri, How Arbitration Works (8th ed. 2016) p. 7–20 ["An arbitration hearing usually is not open to the public, even in the public sector, although some public-sector interest arbitration hearings are open by statute."].)

Garcia points to mandatory labor arbitration statutes dating back to the 1920's which required open proceedings. He cites first to the Kansas Industrial Court Act of 1920 (Kansas Act). The Kansas Act created the court of industrial relations (CIR)—a three-member tribunal, which was really an administrative board, invested with the power to investigate and adjudicate disputes "over certain 'key' industries declared to be essential to the public welfare." (Herbert Rabinowitz, *The Kansas Industrial Court Act* (1923) 12 Cal. L. Rev. 1, p. 2 (Rabinowitz); 1920 Kan.Sess.Laws, ch. 29, §§ 1–3, pp. 36-38.)

The CIR was given the power, either on its own initiative or at the request of a party to a dispute, to investigate and decide any controversy which " 'may endanger the continuity and efficiency … of said industry.' " (Rabinowitz, at p. 2; 1920 Kan.Sess.Laws, ch. 29, § 7, p. 39.) The CIR could issue subpoenas, administer oaths, take testimony, rule on evidence, and adjudicate disputes regarding working conditions and wages. (1920 Kan.Sess.Laws, ch. 29, §§ 5 & 11, pp. 38–39, 41–42.) Testimony was transcribed and became the official record of the proceedings, which were public records open to inspection. (*Id.*, §§ 4 & 5, at pp. 38–39.) A party could bring a proceeding in the Kansas Supreme Court to review the CIR's orders. (*Id.*, § 12, at p. 42.) While the Kansas Act did not expressly state the CIR's proceedings were open to the public, the bill's author described the law as providing "for the adjudication of industrial disputes in very much the same way that other classes of controversies have been adjudicated in all the Anglo-Saxon countries of the world for hundreds of years." (William L. Huggins, *A Few of the Fundamentals of the Kansas Industrial Court Act* (1921) 7 Am. Bar Assn. J. 265, 268.) The Kansas Act, however, was short-lived, as by 1925, the Supreme Court

31.

had invalidated it as unconstitutional in two decisions, *Wolff Co. v. Industrial Court* (1923) 262 U.S. 522, 544 and *Wolff Packing Co. v. Indus. Court* (1925) 267 U.S. 552, 569.

Garcia also points to Colorado's Industrial Relations Act of 1915 (the Colorado Act), which established a new public authority, the industrial commission, and empowered it to intervene in all labor disputes. (*Martin v. Montezuma-Cortez School District RE-1* (1992) 841 P.2d 237, 242 (*Martin*).) The Colorado Act conferred on the industrial commission the power, among other things, to inquire " 'into the extent and results of methods of collective bargaining,' " and "to promote the voluntary arbitration, mediation and conciliation of disputes between employers and employees." (*Martin*, at p. 243.) Employers and employees were subjected to the commission's initial jurisdiction in order to defuse potential labor disputes. (*Id.* at p. 246.)[16]

Voluntary arbitration or mediation could be held before a commissioner or commission-appointed board of arbitration, which had the power to compel the attendance of witnesses, administer oaths, and admit evidence. (1915 Colo.Sess.Laws, ch. 180, §§ 25 & 28, pp. 575–577, 577-578.) Findings, orders, awards or decisions of the commissioner or board of arbitration, when approved and confirmed by the commission, were deemed to be the commission's finding, order, award or decision, but they were not binding on the parties unless the parties agreed in writing. (*Id.*, §§ 27 & 31, pp. 577, 579.) "[S]essions of the commission" were open to the public and its proceedings a

---

**16** As explained by the Colorado Supreme Court: "Employers and employees were required to give notice to the industrial commission before engaging in a 'lockout or strike, or a suspension or discontinuation of work or employment' on account of a dispute over compensation or hours. Moreover, the Industrial Relations Act made it 'unlawful for any employer to declare or cause a lockout, or for any employee to go on strike, on account of any dispute prior to or during an investigation, hearing, or arbitration of such dispute by the commission….' [Citation.] After such dispute 'has been duly investigated, heard, or arbitrated,' employers and employees were free to lockout or to strike, respectively.' " (*Martin*, *supra*, 841 P.2d at p. 243.)

public record.  (*Id.*, § 9, p. 567.)[17]  The commission's findings, orders or awards were subject to review first by the commission itself, and then by a district court.  (*Id.*, §§ 34-37, pp. 580–582.)

Finally, Garcia asserts that several California city and county charters, as well as out-of-state statutes and administrative rules, mandate public access to public-sector interest arbitrations.  (See Sac. County Charter, art. XVIII, § 94(c) [mandating that arbitrators "hold public hearings, receive evidence from the parties and cause a transcript of the proceedings to be prepared"]; Anaheim City Charter, art. X, § 1053 [same]; S.F. Charter, § A8.590-5 [same]; Del. Code, tit. 19, ch. 13, § 1313(b) ["Hearings conducted by binding interest arbitrators shall be open to the public."]; Or. Admin. Rules, ch. 115, div. 40, rule 115-040-0015(7)(e) [binding interest arbitration hearings "shall be open to the public unless otherwise mutually agreed to by the parties"]; Iowa Code, tit. I, ch. 20, § 20.17(3) [bargaining sessions at which the parties present their initial bargaining positions are open to the public, as are "[h]earings conducted by arbitrators"].)

The Board, in contrast, points to California public-sector labor relations statutes, which provide for private factfinding in the event of a public agency's impasse in negotiations with a union.  For example, the EERA, governing labor relations in California's public school system, provides for a factfinding panel in the case of an impasse, which may hold hearings at which testimony is taken and evidence produced.  (Gov. Code, §§ 3548.1, 3548.2.)  If the dispute is not settled, the panel makes factual findings and an advisory recommendation as to settlement terms, which are submitted to the parties privately before they are made public.  (*Id.*, § 3548.3, subd. (a).)  The EERA

---

**17**    The industrial commission act, however, is silent on whether voluntary mediations and arbitrations were open to the public.  The commission could "regulate the mode and manner of all investigations and hearings" (1915 Colo.Sess.Laws, ch. 180, § 11(f), pp. 568–569), and delegate to agents conducting investigations on the commission's behalf "the taking of all testimony bearing upon any investigation or hearing" (*id.*, § 17, p. 572).

33.

exempts factfinding proceedings from open meeting requirements. (Gov. Code, § 3549.1, subd. (c).) The same is true with respect to the Higher Education Employer-Employee Relations Act governing labor relations with the University of California. (Gov. Code, §§ 3592, 3593, subd. (a), 3596.)

### 4. Experience Analysis

According to these histories, while there is a strong tradition of openness for civil trials, the same tradition is lacking as to collective bargaining and labor arbitrations. Moreover, Garcia has not provided us with any significant history relating to compulsory interest arbitration. The Kansas Act was short-lived, and while the Colorado Act provided for open proceedings, it appears the commission's decisions were not binding on the parties unless they agreed to be bound. That public-sector interest arbitration hearings are open to the public in some states does not establish a strong tradition of openness for private-sector interest arbitration hearings such as MMC proceedings.[18]

Garcia contends the strong tradition of openness of civil trials should apply to on-the-record MMC proceedings, citing *Strine*. There, the Third Circuit Court of Appeals was required to determine whether the public had a First Amendment right of access to Delaware's state-sponsored arbitration program, which created an arbitration process as an alternative to trial for business disputes where the amount in controversy exceeds one million dollars. (*Strine, supra,* 733 F.3d at p. 512.) Arbitrations between qualified parties, who had to consent to the proceeding, were presided over by a chancery court judge and conducted in a Delaware courthouse during normal business hours. Once a decision was reached, a final judgment or decree was entered automatically, and the parties had the right to appeal the resulting " 'order of the Court of Chancery,' " to the

---

[18] As our high court recognized in *Gerawan Farming I*, interest arbitration in the private sector is rare, and "likely stems from the high court's determination that the NLRA, which preempts most state labor regulation, does not authorize compulsory arbitration." (*Gerawan Farming I, supra,* 3 Cal.5th at p. 1140.)

Delaware Supreme Court, which reviewed the arbitration under a deferential standard of review. The statute and rules governing Delaware's proceedings barred public access, and the record of the proceedings was considered confidential and not a public record. (*Id.* at p. 513.)

The appellate court applied the experience and logic test to determine whether there was a right of access to Delaware's arbitration process. (*Strine, supra,* 733 F.3d at p. 515.) With respect to the experience prong, the court found, after reviewing the history of openness of civil trials and arbitrations, that history "demonstrates a strong tradition of openness for proceedings like Delaware's government-sponsored arbitrations." (*Id.* at p. 518.) The court explained: "Proceedings in front of judges in courthouses have been presumptively open to the public for centuries. History teaches us not that all arbitrations must be closed, but that arbitrations with non-state action in private venues tend to be closed to the public. Although Delaware's government-sponsored arbitrations share characteristics such as informality, flexibility, and limited review with private arbitrations, they differ fundamentally from other arbitrations because they are conducted before active judges in a courthouse, because they result in a binding order of the Chancery Court, and because they allow only a limited right of appeal." (*Ibid.*, fn. omitted.) The court further explained that "[w]hen we properly account for the type of proceeding that Delaware has instituted—a binding arbitration before a judge that takes place in a courtroom—the history of openness is comparable to the history" of civil or criminal trials. (*Ibid.*) Thus, the court found its "experience inquiry" counseled in favor of granting public access to Delaware's proceeding because the place and process of the proceeding had historically been open to the press and public. (*Ibid.*)

MMC, however, differs from the state-sponsored arbitration in *Strine*. As Garcia correctly points out, on-the-record MMC proceedings have many of the features of a civil trial. As in a civil trial, each party has the right to be represented by counsel, present

evidence and cross-examine witnesses. The mediator has the authority to administer oaths, subpoena witnesses, hear sworn testimony, rule on the admission and exclusion of evidence, sanction parties, and proceed with hearings even if one party refuses to participate. MMC proceedings, however, are not held before a judge, do not take place in a courtroom or courthouse, and do not result in a court-issued order. Instead, MMC proceedings are conducted by a private mediator who is not a public official and the parties pay the costs of the process. (§ 1164, subd. (b); *Hess, supra,* 140 Cal.App.4th at p. 1608 ["The act of delegating legislative authority to a private mediator does not render the mediator a public official."].) Unlike the arbitrations in *Strine*, MMC is not judicial or even quasi-judicial; rather, MMC results in quasi-legislative action by which the mediator determines the terms of the collective bargaining agreement imposed on the employer by force of law. (*Gerawan Farming I, supra,* 3 Cal.5th at p. 1133; *Hess, supra,* 140 Cal.App.4th at p. 1597.)

On-the-record MMC proceedings also differ from civil trials because they operate as "a continuation of the ordinary bargaining process." (*Gerawan Farming I, supra,* 3 Cal.5th at p. 1156.) They simply formalize the usual give and take of contractual negotiations with a mediator, so the ultimate decision can be more accurately reviewed on appeal. When the Board orders MMC, the parties identify for the mediator the disputed and undisputed issues of their negotiations, provide the standards for resolving the disputed issues, and present evidence as to each disputed issue. During the presentation of evidence, the mediator may go off the record to informally resolve the disputed issues. (Cal. Code Regs., § 20407.) Contrary to Garcia's assertion, the proceedings are not intended to be adversarial; rather, they are intended to be factfinding proceedings that create a record from which the mediator determines those terms the parties are unable to resolve by the end of the MMC process.[19] Throughout the process,

---

[19]     As a Pennsylvania court explained, " '[t]he purpose of arbitration represents an extension of the collective bargaining process. Both sides present proposals and

the parties are free to resolve the disputed issues. As our high court recognized, "the parties may reach a voluntary agreement on all or most of the disputed terms before the mediator writes a final report or before the ALRB issues its final order." (*Gerawan Farming I, supra,* 3 Cal.5th at p. 1156; Cal. Code Regs., § 20407, subd. (e) ["Where the parties agree to a collective bargaining agreement without the issuance of a mediator's report, as defined in subdivision (d), the parties shall notify the Board and submit a copy of the signed agreement pursuant to Regulation 20450."].)

Thus, on-the-record MMC proceedings are part and parcel of the negotiating process. As our high court explained, "[t]he *availability* of interest arbitration, as an ultimate recourse, is itself a bargaining tool that the Legislature believed would facilitate resolution of disputes and consummation of first agreements." (*Gerawan Farming I, supra,* 3 Cal.5th at p. 1157 [noting that other courts "have similarly described interest arbitration 'not as a substitute for collective bargaining, but as an instrument of the collective bargaining process' "].)

Garcia, however, attempts to separate on-the-record MMC proceedings from the collective bargaining process. He asserts MMC consists of two phases—an off-the-record phase that proceeds for at least 30 days, followed by a second, on-the-record phase, which begins when the mediator formally "certif[ies] that the mediation process has been exhausted." (§ 1164, subd. (c).) Garcia claims that once the second phase begins, bargaining has ended. The Board asserts this is incorrect, as the "mediation" described in the statute *is* the interest arbitration proceeding, and the mediator's

supporting evidence to allow the arbitrators to make a decision on the issues presented to them.' By its very nature, it is an informal proceeding." (*Dunmore Police Ass'n v. Dunmore Bor*. (Pa.Cmwlth.Ct. 1987) 107 Pa.Cmwlth. 306, 311 [528 A.2d 299, 301]; see *County of Essex*, *supra*, N.J. PERC No. 2005-52, pp. 6–7 ["Interest arbitration is an extension of the negotiations process … and throughout formal arbitration proceedings the arbitrator may continue to mediate and assist the parties in reaching a mutually agreeable settlement …. Thus, interest arbitration is a labor relations process, not a civil action….].)

37.

certification that the process has been exhausted only operates to trigger the 21-day period for the mediator to file a report with the Board. (§ 1164, subd. (d); Cal. Code Regs., § 20407, subd. (c).)

The Board's interpretation is supported by the implementing regulations, which do not prescribe separate off- and on-the-record proceedings, but instead contemplate a fluid process that allows the mediator to go off the record at any time to resolve issues informally and, if this is not successful, to conclude the process with interest arbitration. (Cal. Code Regs., § 20407, subd. (a)(2).) Regardless of when the mediator certifies the mediation process has been exhausted, bargaining does not necessarily end when on-the-record proceedings begin, as off-the-record discussions may continue even during on-the-record proceedings and, as contemplated in the regulations, the parties may reach an agreement on the disputed terms, thereby eliminating the need for the mediator to issue a report. (*Id*., § 20407, subd. (e).) This is consistent with our high court's description of the process, in which it noted the MMC statute requires the parties, with the mediator's assistance, to "conduct considerable negotiation before the interest arbitration phase," but recognized that in many cases, the parties may reach a voluntary agreement on disputed terms before the mediator's report is written or the Board issues its final order. (*Gerawan Farming I, supra,* 3 Cal.5th at p. 1156.)

We therefore reject Garcia's contention that on-the-record MMC proceedings and civil trials are "functionally comparable." (*Butz v. Economou* (1978) 438 U.S. 478, 513.) MMC proceedings do not "walk[], talk[], and squawk[]" like a lawsuit. (*South Carolina Ports v. Federal Maritime Com'n* (4th Cir. 2001) 243 F.3d 165, 174, affd. *Federal Maritime Comm'n v. South Carolina Ports Authority* (2002) 535 U.S. 743.) This is not a situation where the government has tried to deprive the public of an access right it once possessed by assigning to an administrative agency a function courts historically performed or dressing up a civil trial in the guise of an administrative hearing. (*North Jersey, supra,* 308 F.3d at p. 215; *NYCLU, supra,* 684 F.3d at p. 301.) Moreover, the

right of access to compulsory interest arbitration is not "deeply rooted in the way the judiciary functions in a democratic society," as was the government-sponsored arbitration in *Strine*. (*Strine, supra,* 733 F.3d at p. 518.)

Garcia emphasizes that we must look to the process involved in on-the-record MMC proceedings. (*NYCLU, supra,* 684 F.3d at pp. 301–302.) We agree. That process involves the presentation of each party's respective contract proposals and supporting rationales to the mediator, who may go off the record at any time throughout the proceeding to resolve issues and, if the parties do not reach an agreement as to all disputed terms, issues a report that resolves all issues and establishes the final terms of a collective bargaining agreement. There is nothing to suggest, however, that this process was presumptively open or that it boasts a sufficient tradition of openness to satisfy *Richmond Newspapers* or *Press-Enterprise II*. We may not "dispense with the Richmond Newspapers 'experience' requirement where history is ambiguous or lacking," or "recognize a First Amendment right based solely on the 'logic' inquiry." (*North Jersey, supra,* 308 F.3d at p. 213.)

## C. The Logic Prong

Since we have not found a strong showing of openness under the experience prong, we need not address the logic prong, as both elements are required. Nevertheless, we conclude that there is not a right of access under the logic prong.

The logic analysis requires a court to consider " 'whether public access plays a significant positive role in the functioning of the particular process in question.' " (*PG Pub., supra,* 705 F.3d at p. 110.) The Supreme Court has identified various utilitarian attributes or benefits of open trials, which help explain why they are entitled to constitutional protection: (1) they "enhance the performance and accuracy of trial proceedings, educate the public, and serve a 'therapeutic' value to the community"; (2) they "serve to demonstrate that justice is meted out fairly, thereby promoting public confidence in such governmental proceedings"; (3) they "provide a means … by which

citizens scrutinize and 'check' the use and possible abuse of judicial power"; and (4) they "serve to enhance the truth-finding function of the proceeding." (*NBC Subsidiary, supra,* 20 Cal.4th at pp. 1200–1202.)[20]

"In addition to considering the benefits that would result from press and public access, we must 'take account of the flip side—the extent to which openness impairs the public good.' [Citation.] Indeed, the logic analysis *must* account for the negative effects of openness, for otherwise 'it is difficult to conceive of a government proceeding to which the public would not have a First Amendment right of access.' " (*PG Pub., supra,* 705 F.3d at p. 111.) Like the experience prong, the logic inquiry is an objective one. (*Ibid.*)

Here, Garcia contends public access to on-the-record MMC proceedings plays a significant positive role in the functioning of the MMC process. He asserts "[t]he MMC process involves extensive fact-finding that would be improved by public scrutiny." Specifically, he argues public access would: (1) allow Gerawan employees and others to independently gauge the testimony at the hearing; (2) increase "the 'testimonial trustworthiness' of the[] witnesses"; (3) " 'foster[] an appearance of fairness, thereby heightening public respect for the judicial process' "; and (4) provide information which would lead to a better understanding of the government's operation and confidence in, and respect for, our judicial system.

---

[20]     Similarly, the Third Circuit has identified "six broad 'values' that are typically served by openness: [¶] [1] promotion of informed discussion of governmental affairs by providing the public with the more complete understanding of the [proceeding]; [2] promotion of the public perception of fairness which can be achieved only by permitting full public view of the proceedings; [3] providing a significant community therapeutic value as an outlet for community concern, hostility and emotion; [4] serving as a check on corrupt practices by exposing the [proceeding] to public scrutiny; [5] enhancement of the performance of all involved; and [6] discouragement of [fraud]." (*PG Pub., supra,* 705 F.3d at pp. 110–111.)

While these goals certainly would be served by public access to on-the-record MMC proceedings, we also must account for the negative effects of openness, which relate to the nature of the collective bargaining process. As the Board explained in its decision denying access, the purpose of the MMC process is to build a labor negotiation relationship between the parties to both accomplish the creation of the first contract and further the parties' future negotiations, and during labor contract negotiations, "strategic compromises are often made" that further these goals. (*Gerawan Farming, supra,* 39 ALRB No. 13, p. 7.) If on-the-record proceedings were open to the public, those "compromises would not be made with the prospect of real-time publicity of those compromises and demands for explanations prior to the conclusion of negotiations. '[L]abor negotiations are conducted in private in order that negotiators may speak freely without fear of offending their constituencies and reach compromises without appearing weak.' " (*Ibid.*)

Moreover, as we have stated, rank-and-file employees do not have an independent right to attend collective bargaining negotiations. (*Petaluma City, supra,* PERB Dec. No. 2485-E, p. 29.) This is premised on the union's legal status as the employees' exclusive representative, which necessarily includes "the derivative right of the duly elected bargaining agent to select the bargaining team which will represent it at the negotiating table." (*General Electric Co.* (1968) 173 NLRB 253, 254, enfd. by *General Electric Company v. NLRB* (2d Cir. 1969) 412 F.2d 512, 516–517 ["This right of employees and the corresponding right of employers … to choose whomever they wish to represent them in formal labor negotiations is fundamental to the statutory scheme. In general, either side can choose as it sees fit and neither can control the other's selection, a proposition confirmed in a number of opinions, some of fairly ancient vintage."].)

As explained in *Petaluma City*: "If employees could assert an independent statutory right to attend negotiations, even against the wishes of their bargaining representative, then much of the decisional law prohibiting direct dealing and bad-faith

41.

bargaining would need to be rewritten.  Granting employees unfettered access to negotiations would permit the employer to comment directly to the employees on the bargaining proposals and conduct of their representatives.  Indeed, employers would be *required* to present proposals simultaneously to employees and the representative anytime employees were present.  Even if employees remained silent observers, their mere presence at negotiations could 'substantially modif[y] the collective-bargaining system … by weakening the independence of the 'representative' chosen by the employees,' because it would 'enable[] the employer, in effect, to deal with its employees rather than with their statutory representative.' " (*Petaluma City, supra,* PERB Dec. No. 2485-E, pp. 32–33.)  These principles hold true in collective bargaining procedures like MMC, which operate as part of the bargaining process.  As the Board asserts, these circumstances present the employer the opportunity to "driv[e] a wedge between" the union and employees. (*Safeway Trails, Inc.* (1977) 233 NLRB 1078, 1081.)

Garcia responds that the rationale for holding closed proceedings, namely, that confidentiality can encourage compromise, "defies logic," as no bargaining occurs during the on-the-record phase.  As we have explained, this view of MMC proceedings is incorrect, as bargaining can occur during the on-the-record phase and may result in the parties reaching an agreement on disputed terms.  Garcia also argues the contention that the presence of employees at on-the-record MMC proceedings would drive a wedge between those employees and the union is nullified because a transcript of the testimony is available to the public.  The transcript, however, is not available until the official record is available, presumably at the conclusion of the MMC proceedings.  Thus, while the employer's proposals may eventually be revealed, it would not be until after the terms of a collective bargaining agreement have been determined, either by the parties or the mediator.

Garcia asserts a union's right to be the employees' exclusive representative does not permit the state to infringe on the First Amendment right of access of employees and

the public.  Garcia claims that by denying workers the ability to witness the proceedings and discuss the MMC process, the state is interfering with their "absolute right" to consult among themselves and communicate their views to the public, citing *City of Madison Sch. Dist. v. Wisconsin Emp. Rel. Comm'n* (1976) 429 U.S. 167 (*City of Madison*).

The rights at issue in the present case are wholly unlike those at stake in *City of Madison*, in which the Supreme Court "upheld a claim of access to a public forum, applying standard public-forum First Amendment analysis." (*Minnesota Bd. for Community Colleges v. Knight* (1984) 465 U.S. 271, 281.)  "The school board meetings at issue there were 'opened [as] a forum for direct citizen involvement,' [citation], and 'public participation [was] permitted,' [citation].  The First Amendment was violated when the meetings were suddenly closed to one segment of the public even though they otherwise remained open for participation by the public at large." (*Ibid.*)  This case, in contrast, does not involve selective closure of a generally open forum, and hence any reliance on *City of Madison* is misplaced.

Moreover, the principle of union exclusivity is not being used to "muzzle a public employee who, like any other citizen, might wish to express his view about governmental decisions concerning labor relations." (*Abood v. Detroit Board of Education* (1977) 431 U.S. 209, 230, overruled by *Janus v. American Federation of State, County, and Mun. Employees, Council 31* (2018) ___U.S.___ [138 S.Ct. 2448, 2460].)  Garcia and the other Gerawan employees always remained free to express their views about the collective bargaining process, including MMC.  (See *Minnesota Bd. for Community Colleges v. Knight, supra,* 465 U.S. at p. 288 [faculty members speech and associational rights not infringed by state's restriction of participation in meet and confer sessions to faculty's exclusive representative; the state has not restrained the faculty members' freedom to speak or their freedom to associate, and has not attempted to suppress any ideas].)

43.

Garcia next contends the "logic" prong demands that MMC be open to the public because there are due process violations inherent in secret proceedings.[21]  In support, he cites cases which discuss the due process requirements in administrative proceedings of a quasi-judicial character or are otherwise distinguishable.  (See *Anti-Fascist Committee v. McGrath* (1951) 341 U.S. 123, 201, fn. 15 (dis. opn. of Reed, J.) [stating that the statutory requirement for a hearing in *Morgan v. United States* (1938) 304 U.S. 1, 14, explains the statement in that case that " 'in administrative proceedings of a quasi-judicial character the liberty and property of the citizen shall be protected by the rudimentary requirements of fair play.  These demand "a fair and open hearing," … [which] has been described as an "inexorable safeguard." ' "]; *Ohio Bell Tel. Co. v. Comm'n.* (1937) 301 U.S. 292, 300 [company deprived of "fair hearing essential to due process" when public utilities commission ordered refunds based on unknown documents and failed to report the proofs underlying its calculations]; *Fitzgerald v. Hampton* (D.C. Cir. 1972) 467 F.2d 755, 756, 764–767 [due process required quasi-judicial hearing on employee's appeal for reinstatement to federal employment to be open to the public; "Where administrative proceedings have been challenged on grounds of procedural due process, the Supreme Court's decisions have consistently distinguished the due process requirements in administrative proceedings of a quasi[-]judicial character from the due process requirements in proceedings which are purely investigative and fact-finding."]; *Pechter v. Lyons* (S.D.N.Y. 1977) 441 F.Supp. 115, 117–118 [regulation requiring open deportation hearings manifests the policy that "judicial proceedings, especially those in which the life or liberty of an individual is at stake, should be subject to public scrutiny"].)

---

[21]     Notably, neither Garcia nor Gerawan alleged a due process violation in their complaints.  Moreover, while Gerawan made a due process argument in the trial court, Garcia did not.

Here, as we have explained, MMC proceedings are not quasi-judicial hearings and are not comparable to judicial proceedings. While Garcia finds it "impossible to understand how public observation would hamper" the goals of achieving a contract and building a labor relationship, as explained in *Petaluma City*, the mere presence of employees at collective bargaining negotiations could substantially modify the collective bargaining system by weakening the independence of the employees' union representative. (*Petaluma City, supra,* PERB Dec. No. 2485-E, p. 33.)

Finally, Garcia contends the Board's rationale for denying access to MMC proceedings, as stated on page seven of the Board's Order, that "compromises would not be made with the prospect of real-time publicity of those compromises and demands for explanations prior to the conclusion of negotiations," results in both a prior restraint of speech and viewpoint discrimination. He asserts the right of access to government proceedings includes the right to receive information and listen, as well as to disseminate informed opinions from the information received; therefore, "viewpoint discrimination—whereby a government action has the effect of fostering the dissemination of certain opinions and discouraging the dissemination of others—and prior restraints—whereby the government attempts to prevent the publication of certain opinion either through an outright ban or unduly burdensome regulations—are part and parcel of a right-of-access claim." Essentially, Garcia is contending that if he does not have access to the information presented in on-the-record MMC proceedings, he is precluded from disseminating that information and his opinion about it, while those who attended the proceeding are able to disseminate theirs.

As the Board points out, the present case has nothing to do with prior restraints or viewpoint discrimination. The Board's Order does not prevent Garcia, or anyone else, from publishing or reporting information, or expressing any particular viewpoint. There is no issue here concerning the trial court's authority to prevent the publication of information, as in *Nebraska Press Assn. v. Stuart* (1976) 427 U.S. 539. Instead, the case

45.

concerns access to information. (*Application of The Herald Co.* (2d. Cir. 1984) 734 F.2d 93, 96 [issue of whether the First Amendment limits a trial judge's authority to exclude the public from a pretrial suppression hearing involved access to information, not prior restraint]; see *Gannett Co. v. DePasquale* (1979) 443 U.S. 368, 393, fn. 25 [order excluding press from suppression hearing in criminal case did not involve a direct prior restraint, as it did not prevent the publication of information in the petitioner's possession]; *Application of National Broadcasting Co., Inc.* (1987) 828 F.2d 340, 343 [case concerned the media's right to access court documents in a criminal case, not a district court's order restraining the media from publishing or broadcasting documents in its possession].)

While the rights of access and publication both have their roots in the First Amendment, "these principles are doctrinally discrete, and precedents in one area may not be indiscriminately applied to the other. In general, the right of publication is the broader of the two, and in most instances, publication may not be constitutionally prohibited even though access to the particular information may properly be denied." (*First Amendment Coal. v. Judicial Inquiry & Review* (3d Cir. 1986) 784 F.2d 467, 471-472.) Here, "the government is not restricting access to information per se; rather, it is restricting access to a particular proceeding," namely, on-the-record MMC proceedings. (*PG Pub., supra,* 705 F.3d at p. 101.) Garcia and other employees are free to contact the participants in the MMC proceeding to obtain information about what went on inside. (*Ibid.*; see *Petaluma City, supra,* PERB Dec. No. 2485-E, p. 32 ["an employer is free to communicate with exclusively-represented employees about negotiations"].)

The Order also does not constitute viewpoint discrimination. An on-the-record MMC proceeding is not a forum for the public to express differing views regarding the collective bargaining agreement; by excluding employees and the general public, the Board is not allowing "the presentation of one side of a highly controversial issue," while excluding the opposing view. (*San Diego Committee v. Governing Bd.* (9th Cir. 1986)

790 F.2d 1471, 1481.) Instead, it is a negotiation between the employees' exclusive bargaining representative and the employer. While Garcia complains that the Order allowed the union to select its own representatives, an exclusive bargaining representative has the right to select its own bargaining team, just as an employer has a right to select its own team. (*General Electric Company v. NLRB, supra,* 412 F.2d at pp. 516–517.) Thus, the access given to union representatives is based on their status rather than their views. (*Perry Ed. Assn. v. Perry Local Educators' Assn.* (1983) 460 U.S. 37, 49 [where rival union alleged certified union's access to teacher mailboxes constituted viewpoint discrimination, "it is more accurate to characterize the access policy as based on the *status* of the respective unions rather than their views."].)

In sum, given that on-the-record MMC proceedings are part of the collective bargaining process, the benefits of open MMC proceedings are far less than the benefits of open criminal or ordinary civil proceedings. This finding, coupled with the absence of a showing of a historical tradition of public access, leads us to conclude there is no constitutional right of public access to on-the-record MMC proceedings. (See *Sorenson, supra,* 219 Cal.App.4th at p. 436 [First Amendment right of access does not apply to involuntary conservatorship proceedings where utility of open involuntary conservatorship proceedings is less than that of open criminal or ordinary civil proceedings and there was no showing such proceedings were historically open].)[22]

---

[22] Two days after oral argument, Gerawan submitted for our consideration a case that was published on the day of oral argument, *First Amendment Coalition of Arizona, Inc. v. Ryan* (9th Cir. Sept. 17, 2019, No. 17-16330) ___F.3d___ [2019 WL 4419676]. There, applying the experience and logic test, the appellate court held "the First Amendment right of access to governmental proceedings encompasses a right to hear the sounds of executions in their entirety." (*Id.* at p. *4.) The court determined the historical tradition of public viewing of executions included the ability to hear its sounds, and "[b]arring witnesses from hearing sounds after the insertion of intravenous lines means that the public will not have full information regarding the administration of lethal-injection drugs and the prisoner's experience as he dies." (*Id.* at pp. *4-5.) In contrast here, there

Accordingly, the trial court did not err in granting summary judgment in favor of the Board, and denying Gerawan's and Garcia's summary judgment motions.

## **DISPOSITION**

The judgment is affirmed.  Costs on appeal are awarded to the Board.


_____

DE SANTOS, J.

WE CONCUR:


_____

FRANSON, Acting P.J.


_____

PEÑA, J.

---

is not a strong historical tradition of public access to on-the-record MMC proceedings, and the benefits of openness are far less than that of criminal proceedings.